UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CALEB EUBANKS, *individually, and on behalf of all other similarly situated*, | * * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 22-cv-10334-ADB |
| GASBUDDY, LLC, | * * | |
| Defendant. | * * * * | |

**MEMORANDUM AND ORDER ON GASBUDDY'S ALTERNATIVE MOTIONS TO COMPEL AND DISMISS AND EUBANKS' MOTION FOR LEAVE TO AMEND**

BURROUGHS, D.J.

Caleb Eubanks ("Eubanks") brings this action against GasBuddy, LLC ("GasBuddy") alleging negligent misrepresentation and violation of Mass. Gen. Laws c. 93A. Currently before the Court is GasBuddy's motion to compel arbitration under the Federal Arbitration Act ("FAA") and alternatively to dismiss the complaint under Fed. R. Civ. P. 12(b)(6), [ECF No. 18], and Eubanks' motion for leave to file an amended complaint under Fed. R. Civ. P. 15(a), [ECF No. 23]. For the reasons set forth below, GasBuddy's motion to compel arbitration, [ECF No. 18], is GRANTED and Eubanks' motion for leave to amend, [ECF No. 23], is DENIED.

I.   BACKGROUND

   A.   Factual Background

The Court draws the following facts from the complaint and the affidavits and documents submitted in support of the motion to compel arbitration. See Cullinane v. Uber Techs., Inc., 893 F.3d 53, 55 (1st Cir. 2018) (citation omitted). GasBuddy is a Limited Liability Company

1

organized under the laws of Delaware, whose managers are domiciled in Massachusetts, Maryland, and/or Georgia. [ECF No. 1 ("Compl.") ¶¶ 12–13]. GasBuddy markets a mobile app and payment card system "as a way for consumers to save money on fuel costs." [Id. ¶ 2]. Eubanks is a citizen and resident of Texas, seeking to represent a nationwide putative class comprised of GasBuddy users. [Id. ¶¶ 11, 14].

GasBuddy advertises that its service is "like a debit card" which "'effortlessly deducts' funds from linked checking accounts at the time of purchase[.]" [Compl. ¶¶ 4, 26, 83]. To sign up for GasBuddy, users provide basic information including a name, address, phone number, driver's license number, and bank account information. [Id. ¶ 22]. Users do not pay to sign up for GasBuddy, though users may opt to pay a monthly subscription fee of $4.99 for an increased level of per-gallon discounts, which Eubanks did. [Id. ¶¶ 22, 42]. When sign-up is complete, GasBuddy ships the user a "Pay with GasBuddy" card that can be used to pay at certain gas stations at a discounted price per gallon. [Id. ¶¶ 26–27]. GasBuddy advertises that the payments and discounts are "automatically applied." [Id. ¶ 33]. The GasBuddy website proclaims that "GasBuddy has saved drivers $3.1 billion and is used by more North Americans to save money on gas than any other app." [Id. ¶ 29].

Eubanks alleges, however, that GasBuddy fails to warn users of the risks of using its service, particularly, that users can incur significant overdraft ("OD") fees or non-sufficient funds ("NSF") fees on the bank accounts linked to their GasBuddy cards. [Compl. ¶¶ 29, 35, 40, 42]. Eubanks contends that, despite GasBuddy's representations of instant payment and guaranteed savings, paying with a GasBuddy card results in significant processing delays, which, in practice, means that users risk running out of funds in their accounts before GasBuddy has

processed payment, resulting in overdraft fees. [Id. ¶ 34]. GasBuddy does not verify the presence of sufficient funds in a checking account before withdrawal. [Id. ¶ 35].

The complaint also identifies other purported GasBuddy practices that result in increased fees. First, GasBuddy's processing practices "maximize the number of OD/NSF fees assessed on its users" because it "often splits debits it makes on its users' accounts into two or more debits, with each one causing an OD/NSF fee." [Compl. ¶ 43]. Second, "[b]ecause GasBuddy groups debit transactions together, sometimes over several days, then submits giant batches for processing through the network, the processing of transactions is delayed for several days." [Id. ¶ 36].

Eubanks avers that, although he has "saved a few pennies per gallon" by using the card, he has incurred at least $200 in OD fees from his bank. [Compl. ¶ 40]. He contends that GasBuddy has engaged in deceptive marketing practices that fail to warn consumers of, and, further, conceals from them, the significant risks of using its service despite its knowledge that the service is likely to cause users to incur these bank fees. [Id. ¶¶ 46–53]. Had he been adequately informed of the risk of these fees, Eubanks says he would not have used GasBuddy. [Id. ¶¶ 30, 41–42, 52].

The parties agree that during his sign-up process Eubanks was presented with GasBuddy's Enrollment Terms and Conditions ("Terms and Conditions") or a link thereto. See [Compl. ¶ 25; ECF No. 19-1 at 1–2; ECF No. 23 at 3]. It is also undisputed that those Terms and Conditions explicitly require users to arbitrate "[a]ny dispute, claim or controversy arising out of

or relating to" the parties' agreement. [ECF No. 19-1 at 36, ¶ 24.1].[1] GasBuddy adds that, at the time Eubanks registered for GasBuddy, whether he did it through the app or the website, he was presented with the following statement: "By signing up you agree to GasBuddy's Terms & Conditions and Privacy Policy as well as our partner Dwolla's Terms of Service and Privacy Policy." [ECF No. 19-1 at 8; ECF No. 19 at 8–9].

While the parties agree that Eubanks was presented with at least a hyperlink to the Terms and Conditions, they dispute whether the sign-up process required him to affirmatively assent to them. See [Compl. ¶ 25; ECF No. 19-1 at 1–2; ECF No. 23 at 3]. GasBuddy contends that when Eubanks registered in September 2018, there was an "I'm Ready to Start Saving" button required to proceed with the process, which was "disabled and cannot be clicked unless the user first checks [a] 'I agree' button." [ECF No. 19 at 9]. Eubanks disputes that any such checkbox button existed when he signed up. [Compl. ¶ 25].

B.  **Procedural Background**

Eubanks filed his two-count complaint on March 2, 2022. [Compl.]. GasBuddy filed the instant motion to compel arbitration or alternatively dismiss the complaint for failure to state a claim on May 2, 2022. [ECF No. 18]. The Court than granted leave for the parties to conduct

---

[1] The Terms and Conditions also prohibit Class Actions.

> No Class Actions: The Parties hereto acknowledge and agree that this arbitration shall be solely between the Parties to this Agreement, and no class arbitration, or other representative action may be undertaken by the arbitrator. The parties further agree that the arbitrator shall not have the power to combine this with any other arbitration or to treat this as a representative action, or as a class action.

[ECF No. 19-1 at 36, ¶ 24.2]. They also allow users to opt-out of arbitration: "Opt-Out: You may elect to opt out of this Arbitration Provision by sending written notice to GasBuddy to be received by the close of business on or before the thirtieth (30th) calendar day after this Agreement is executed / accepted." [Id. ¶ 24.3].

limited discovery related only to the enforceability of the Terms and Conditions. [ECF Nos. 14–15]. On August 22, 2022, Eubanks moved for leave to file an amended complaint, seeking to add a second plaintiff and to clarify his allegations in response to GasBuddy's motion, [ECF No. 23], which GasBuddy has opposed, [ECF No. 28].

Eubanks has not opposed GasBuddy's motion to compel arbitration and dismiss the complaint, "but that does not absolve this Court of its duty to review the substance of [GasBuddy's] request and consider whether the relief sought is appropriate." Sullivan v. Kenneway, No. 19-cv-10099, 2019 WL 2085409, at *2 (D. Mass. May 13, 2019). This is especially true, where, as here, Eubanks has partly responded to the GasBuddy's arguments in his motion to amend.

## II.     MOTION TO COMPEL ARBITRATION

### A.     Legal Standard

This Court's review of GasBuddy's motion to dismiss and compel arbitration is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. The FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006)). According to the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The party that seeks to compel arbitration is the one that bears the burden of proving "that a valid agreement to arbitrate exists, the movant has a right to enforce it, the other party is bound by it, and that the claim asserted falls within the scope of the arbitration

agreement." Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16–17 (D. Mass. 2018) (citing Bekele v. Lyft, Inc., 199 F. Supp. 3d 284, 293 (D. Mass. 2016), aff'd, 918 F.3d 181 (1st Cir. 2019)). "The FAA does not compel arbitration unless the Court is satisfied that there exists a valid agreement to arbitrate." Emmanuel v. Handy Techs., Inc., 442 F. Supp. 3d 385, 391 (D. Mass. 2020) (citing Volt. Info. Scis., Inc. v. Bd. Of Trs. Of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989)), aff'd sub nom. Emmanuel v. Handy Techs., Inc., 992 F.3d 1 (1st Cir. 2021). "Consequently, arbitration clauses are subject to 'generally applicable contract defenses' available under state law." Id. (quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339–40 (2011)).

The Supreme Judicial Court of Massachusetts has explained that fundamentals of online contract formation are not different from ordinary contract formation. See Kauders v. Uber Techs., Inc., 159 N.E.3d 1033, 1048 (2021) (citing Sgouros v. TransUnion Corp., 817 F.3d 1029, 1034 (7th Cir. 2016) (applying the reasonableness standard for contract formation to an online agreement). To analyze issues of online contract formation, Massachusetts courts employ a two-prong test that "focus[es] on whether there is reasonable notice of the terms and a reasonable manifestation of assent to those terms[.]" Id. at 1049. "The first prong requires that the offeree receive reasonable notice of the terms of the online agreement." Id. Actual notice, where the offeree has reviewed or interacted with the terms before agreeing to them, will satisfy the first prong. Id. Without actual notice, "the totality of the circumstances must be evaluated in determining whether reasonable notice has been given of the terms and conditions." Id. (citing Sgouros, 817 F.3d at 1034–35). The second prong of the test considers "specific actions required to manifest assent" to determine whether the party reasonably manifested assent. Id. at 1050. As

6

the party seeking to enforce the contract, GasBuddy has the burden of proof to fulfill both prongs. Id. at 1049.

"The First Circuit Court of Appeals has yet to address the precise standard of review for a motion to compel arbitration" but district courts in this circuit, and others, have applied the summary judgment standard. Portier v. NEO Tech. Sols., No. 17-cv-30111, 2019 WL 7945683, at *4 (D. Mass. Dec. 31, 2019) (citation omitted), report and recommendation adopted, No. 17-cv-30111, 2020 WL 877041 (D. Mass. Jan. 30, 2020).

**B.     Discussion**

GasBuddy asserts that this was a standard "clickwrap agreement," which involves an "assent process by which a user must click 'I agree,' but not necessarily view the contract to which she is assenting." Cullinane, 893 F.3d at 61 n.10 (quoting Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394–95 (E.D.N.Y. 2015)); see also [ECF No. 19 at 9–10].  "Massachusetts courts 'routinely conclude[ ]' that clickwrap agreements are enforceable and 'reasonabl[y] communicat[e]' an agreement's terms." Emmanuel, 442 F. Supp. 3d at 385 (alterations in original); see also Bekele, 199 F. Supp. 3d at 295–96.

> [C]licking a button that states "I Agree," can help alert users to the significance of their actions. Where they so act, they have reasonably manifested their assent . . . . Where the connection between the action taken and the terms is unclear, or where the action taken does not clearly signify assent, it will be difficult for the offeror to carry its burden to show that the user assented to the terms.

Kauders, 159 N.E.3d at 1051.  Whether a plaintiff actually scrolled through all of the terms presented to them does not affect whether they were reasonably provided notice of their existence. Emmanuel, 442 F. Supp. 3d at 393.

GasBuddy maintains that, at the time Eubanks registered, "a user—including [Eubanks]—could not complete and submit his/her registration for a gas card unless the user first

7

clicked the 'I agree' button." [ECF No. 19 at 9]. In support, GasBuddy has provided images of how the sign-up pages appeared to Eubanks in September 2018—with a checkbox button. [ECF No. 19 at 9; ECF No. 19-1 at 8–9, 22–23]. Nevertheless, Eubanks maintains that there was no such button when he signed up in September 2018, [Compl. ¶ 25], and that GasBuddy has not provided sufficient or reliable evidence to meet its burden and warrant granting the motion to compel, [ECF No. 23 at 2]. Eubanks says that "Gas[B]uddy has relied on admittedly 'broken' images on the Internet Archive (Wayback Machine)[2] to attempt to confirm what the sign-up process looked like at that time[]" and that depositions of GasBuddy employees "revealed that Gas[B]uddy does not have confirmation in its own business records of what the sign-up process for Mr. Eubanks looked like in September[] 2018." [ECF No. 23 at 2]. It is not clear to the Court which testimony Eubanks refers to. GasBuddy has, however, provided the deposition testimony of Yannick Lord, Vice President Product Strategy & Design, Consumer Platforms at PDI Software which owns GasBuddy, in which he stated the following regarding how he retrieved the images of the sign-up process:

> Q.   Do you know whether those design files have been looked at with respect to the sign-up process during the time period that's reflected in the first Coffey declaration?
>
> . . .
>
> A.   Yes. I mean, I have been -- I have downloaded and analyzed the entire archive of design files over the last five, six plus years of GasBuddy's evolution.
>
> Q:   All right. So those design files, where are they stored?
>
> A.   They're stored on Google Drive and they are timestamped. They have the creation date, and anytime they are modified we also keep updated records of each modification to the design as a separate upload.

---

[2] The Wayback Machine Internet Archive is an independent 501(c)(3) non-profit "library" that archives online pages and provides free public access to those pages. See About the Internet Archive, https://archive.org/about/ (last visited Nov. 15, 2022).

[ECF No. 28-1 at 16, 14:15–15:5].

\* \* \*

Q. So other than Google Drive, though, is there a different place you could look to see what an interface looked like for users signing up for GasBuddy?

A. It's -- essentially we have -- we use a program or did use a program called Sketch for designing and prototyping. Every change to the app or the website is first built in a prototype in Sketch and then passed over to development. So any changes that happen within the app are always reflected first in the designs and then in development. So based on the time of the -- the timestamp on the design files for when they were created and when they were uploaded to Google Drive, we can see the window in which they were produced and they would have been active. In addition to that, I validated the designs that were in place using the internet archive to ensure that it was correct for that date.

Q. Is that the Wayback Machine you're referring to?

A. Correct.

[ECF No. 28-1 at 16, 16:17–17:12].

\* \* \*

Q. And when you use the internet archive or the Wayback Machine, as I know it, does -- did the Wayback Machine store each step of the sign-up process?

A. It's broken in places, so you have to jump around from various different sessions to try and get through as much of the process as possible. However, looking at, you know, the three, four or so pages or more I was able to find on the internet archive, they are an exact match for what was in the designs. So I have no reason to believe there would be anything different than what was represented.

[ECF No. 28-1 at 17, 18:16–19:3].

\* \* \*

Q. Okay. And you confirmed by looking at that date stamp that it is -- it was in effect at the time period Mr. Eubanks signed up?

A. Correct. The design file was created on October 27th, 2017, and would have been developed and in place by the time of the sign-up.

9

> Q. How did you confirm that it remained in effect -- you said that it was in effect from October 2017. How did you confirm that it remained in effect at least through the time that Mr. Eubanks signed up?
>
> A. I said it was designed in October 2017. Typically, they -- you know, we have a two- to three-month period from when things are designed through to built. But verifying that was designed in place, as mentioned before, I validated by the internet archive and confirmed with the internet archive when the new design was in place, cross referencing with the design files . . . .

[ECF No. 28-1 at 19, 26:9–20].

\* \* \*

> Q. How do you -- how do you know that checking -- how can you be sure that checking the I agree checkbox was necessary to proceed to the next screen?
>
> A. Because as the designs reflect, a standard process that we use and have used in the past and do use on some other areas of the app and the site is essentially the grayed out proceed button. So when the button I am ready to start saving is pale like that, essentially it's set at 50 percent opacity, it cannot be clicked. And so the logic that would have been in place is you have to check the I agree box in order for the button to turn blue as shown -- you know, the darker blue as shown on the next page. Only once it turns the darker color is it active.

[ECF No. 28-1 at 21, 33:3–17].

Putting aside the reliability of the Wayback Machine archive, or whether the Court may even take judicial notice of the website's materials for their truth, GasBuddy has still adequately demonstrated, through this testimony and the related exhibits, that the checkbox button was a part of the sign-up process when Eubanks signed up for the service and that it obtained his affirmative assent to the agreement. Further, though Eubanks has argued that the checkbox button may not have been there when he signed up, he has not supported that claim with any specific evidence. "[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." Soto v. State Indus. Prods., Inc., 642 F.3d 67, 72 n.2 (1st Cir. 2011) (quoting Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir.2002)).

GasBuddy has thus satisfied its burden of demonstrating that Eubanks had reasonable notice of the Terms and Conditions, including the mandatory arbitration provision, and the motion to compel arbitration is therefore granted.  Having granted the motion to compel arbitration, the Court need not reach GasBuddy's alternative motion to dismiss for failure to state a claim.

### III.    MOTION TO AMEND

Under Fed. R. Civ. P. 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Courts deny leave to amend when a party has shown (1) undue delay in filing, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies, (4) undue prejudice to the opposing party, and (5) futility of amendment.  See United States ex rel. Gagne v. City of Worcester, 565 F.3d 40, 48 (1st Cir. 2009).

The brief discovery conducted with regard to the enforceability of the Terms and Conditions revealed that GasBuddy redesigned its sign-up process some time after Eubanks signed up for his gas card and no longer required users to check an "I Agree" box.  [ECF No. 28 at 2, 4; ECF No. 23 at 3].  Eubanks seeks leave to amend the complaint to add a new plaintiff, Nnabugwu Nwagwu ("Nwagwu"), who he alleges signed up for GasBuddy after the redesign when there was no checkbox.  [ECF No. 23 at 3].  Nwagwu registered for his gas card on January 20, 2020, [ECF No. 28-2 ¶ 2], but the sign-up process did not change until June and July 2020, five months after Nwagwu registered, [Id. ¶ 8 ("[C]hanges to the sign-up process were published (a) on the web on June 15, 2020, (b) on Android June 23, 2020, and (c) on iOS on July 27, 2020."]; see also [ECF No. 28-1 at 15, 12:10–13].  This means the sign-up process was exactly the same for Nwagwu as it was for Eubanks, checkbox and all.  [ECF No. 28-2 at 3, ¶¶ 8–9].  Thus, the proposed amendment would be futile because both Eubanks and Nwagwu were

subject to the same sign-up process and mandatory arbitration provision, which the Court has already found to be enforceable.[3]

## IV.  CONCLUSION

For the above reasons, GasBuddy's motion to compel arbitration, [ECF No. 18], is GRANTED and Eubanks' motion for leave to file an amended complaint, [ECF No. 23], is DENIED.

**SO ORDERED.**

November 16, 2022

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

[3] Eubanks also says that the proposed amendment "would add clarifying allegations regarding the Gasbuddy 'sign-up' process that Plaintiff Eubanks encountered[,]" [ECF No. 23 at 1], but the allegations in both complaints are materially identical, compare [ECF No. 1], with [ECF No. 23-1].